UNITED STATES, Appellee

v

DONALD J. GAGNON, Captain,
U. S. Air Force, Appellant

21 USCMA 158, 44 CMR 212

No. 23,931

January 28, 1972

George W. Latimer, Esquire, argued the cause for Appellant, Accused. With him on the brief were *Colonel Bertram Jacobson, Lieutenant Colonel Norman L. Paul,* and *Major Frank T. Moniz.*

Colonel Henry R. Lockington argued the cause for Appellee, United States. With him on the brief were *Colonel James M. Bumgarner* and *Lieutenant Colonel Robert W. Vayda.*

## Opinion of the Court

DARDEN, Chief Judge:

This case presents an important question on the right of access by an accused's counsel to highly classified defense information to make possible more effective cross-examination of Government witnesses and enhancement of the weight of testimony by defense witnesses.

A general court-martial consisting of a military judge alone convicted Captain Gagnon of assault with intent to commit murder and sentenced him to dismissal, total forfeitures, and confinement at hard labor for six months. Except for 20 days of confinement Captain Gagnon had already served, the convening authority set aside the confinement but approved the rest of the sentence. After the Air Force Court of Military Review affirmed by a split decision, we granted review on the effect of a refusal by

the Government to grant members of the defense an appropriate security clearance and to release the appellant and an Air Force psychiatrist from their oaths not to disclose certain classified information.

After we granted their original petition, appellate defense counsel presented another issue involving the application of our decision in United States v Chilcote, 20 USCMA 283, 43 CMR 123 (1971). The opinion in Chilcote expressed our decision that after a panel of a Court of Military Review had reached a decision in a case, the pertinent statute does not provide for an en banc review of that decision. Although the law permits en banc consideration, such consideration is an alternative to panel review, not a permissible additional step following a panel decision.

We first consider whether the case is properly before us. A panel of the Air Force Court of Military Review affirmed Captain Gagnon's conviction. Later the Air Force Court of Military Review sitting en banc decided the case in exactly the same manner as had the panel; the only difference was the promulgation of a dissenting opinion to the en banc decision.

Appellate Government counsel agree that in this instance the panel had decided the case within the meaning of Chilcote, supra, but they emphasize that the en banc review did not harm Captain Gagnon, since decisions by both the panel and the en banc court were adverse to him in precisely the same degree.

We agree with the appellate defense counsel that en banc consideration of this case conflicted with ▪ our holding in Chilcote, supra. If a potential benefit to Captain Gagnon exists from a vacation of the en banc decision and a reinstatement of the panel one, its substance eludes us. Apparently the only practical effect of our applying Chilcote here would be that we should not entertain any of the reasoning or

arguments presented in the dissenting opinion to the en banc decision. Captain Gagnon obviously desires that we review the result of the panel decision. To conserve the energy of all parties, we treat the panel decision as if it were the basis of Captain Gagnon's original petition, and we proceed to consider the issue this places before us.

The acts constituting the assault on Major Ballou are undisputed. They occurred at the Fuchu, Japan, Officers' Club on the evening of December 6, 1969, when Captain Gagnon stabbed Major Ballou in the kidney area with a hunting knife and said " 'Die, you son of a bitch; die,' " or words to that effect.

For several months before the assault Captain Gagnon had been distraught about the relationship of his wife and Major Ballou. In August of 1969 Captain Gagnon had returned home in the middle of the afternoon and found evidence that caused Mrs. Gagnon and Major Ballou to acknowledge that their relationship had been an adulterous one. After this experience, Captain Gagnon consulted a Dr. Seidel, an Air Force psychiatrist. Between August and December Mrs. Ballou apparently called Captain Gagnon several times to suggest that their spouses were together.

On the night of the assault, the Gagnons and Ballous both visited the Officers' Club. Captain Gagnon took his wife home early and accused her of exchanging alluring glances with Major Ballou at the Club. After an argument during which Mrs. Gagnon informed her husband that she loathed and hated him, he administered a physical assault that was interrupted by the appearance of their two children and a neighbor's child. Mrs. Gagnon fled to the home of a neighbor. Captain Gagnon armed himself with a hunting knife, briefly considered committing suicide with it, and then returned to the Club to accomplish the assault on Major Ballou.

Until July 1969 Captain Gagnon had performed work involving an unusually

high defense classification in the Directorate of Intelligence for the Fifth Air Force. After July he was reassigned to duties of a less sensitive nature. The classification of the work in which Captain Gagnon was engaged before July 1969 was higher than top secret. While serving in that capacity, Captain Gagnon was directly responsible to a Colonel Cooper. All the evidence indicated unanimous agreement that Colonel Cooper was an unusually demanding supervisor, that he disliked Captain Gagnon, and that Captain Gagnon could do nothing that pleased him. All the witnesses who had knowledge of the circumstances also agreed that while Captain Gagnon was working for Colonel Cooper, Captain Gagnon was subjected to a significant degree of stress, not only because of the personal relationship with Colonel Cooper but also because of the volume and content of the classified material Captain Gagnon was responsible for processing.

At the trial, Captain Gagnon's defense was that he was not mentally responsible at the time of the assault on Major Ballou. Two civilian psychiatrists, Doctors Simon L. and Rosalie M. Auster, testified that at the time and place of the offense Captain Gagnon could distinguish right from wrong but could not adhere to the right. Their diagnosis of his mental condition was that he suffered from a "transient situational disturbance" more particularly described as "adjustment reaction of adult life." In their opinion, Captain Gagnon could not adhere to the right because his mental disorder had reached a psychotic stage.

Two psychiatrists on active duty with the Air Force, Dr. Seidel and a Dr. Swaback, testified about their diagnosis that Captain Gagnon's mental condition was that of "emotionally unstable personality," a character or behavior disorder rather than a mental disease, defect, or derangement. They agreed that at the time of the offense Captain Gagnon could distinguish right from wrong and that his ability to adhere to the right was impaired, but not total. They also agreed that Captain Gagnon could entertain the specific intent that is an element of the offense for which he was convicted.

During the time he was performing the extraordinarily secret duties that produced so much stress, Captain Gagnon was responsible for the receipt and processing of many messages having intelligence content, some of which he was required to act on or to bring to the attention of other officers. The judgment he exercised in this assignment became an item of controversy that was important to a determination of which psychiatric diagnosis was correct. In supporting their opinion that Captain Gagnon had a psychotic adjustment reaction, the defense psychiatrists thought he had ordinarily shown good judgment throughout his life. In contrast, to support his opinion that Captain Gagnon had only an emotionally unstable personality, Dr. Seidel found evidence that Captain Gagnon had made errors of judgment and that these were indicative of a particular diagnosis.

Dr. Seidel earlier had the duty of evaluating another officer who had been assigned to the same work as Captain Gagnon in order that Dr. Seidel could make a recommendation on whether that officer should be eliminated from the Air Force. To perform that evaluation, Dr. Seidel had been granted the same security clearances that Captain Gagnon possessed. Consequently, in his discussions with Captain Gagnon after the latter's hospital admission for psychiatric study following the assault, Dr. Seidel could discuss the details of Captain Gagnon's highly classified work, including the content of specific messages and Captain Gagnon's reaction to them.

In developing the desire to explore the nature of Captain Gagnon's extraordinarily secret work and its effect on him, trial defense counsel made several moves. They requested before trial that a temporary special clearance be granted to three officers functioning as defense counsel. This request also sought a briefing at the

area where the work was performed and suggested that Dr. Seidel, the psychiatrist who would be a Government witness, also be given the briefing. In the course of the trial, which, with interruptions, lasted from February 6, 1970, until July 2, 1970, the original request was expanded to include (1) appropriate security clearances for the two civilian psychiatrists who testified for the defense, (2) release of Captain Gagnon from his oath not to disclose classified information so as to permit him to confer with defense counsel, (3) release of Dr. Seidel from his oath not to reveal classified information so that he could be cross-examined, and (4) delivery to defense counsel of certain classified documents Dr. Seidel had examined so that they could be used for his cross-examination and for consideration by defense psychiatrists.

Request for delivery of the specific documents Dr. Seidel had considered was denied by Headquarters, Fifth Air Force, in an endorsement dated April 7, 1970, with the notation that the denial did not "preclude counsel from making a timely and appropriate motion to the military judge since he, in this case, 'decides the ultimate question of legal sanity or insanity of the accused.'"

Both defense counsel and the military judge seemed in doubt about the meaning of the reference to "a timely and appropriate motion to the military judge." Defense counsel moved for "appropriate relief" and the military judge denied the motion.

Appellate defense counsel contend now that the classified information requested by the defense was vital to the accused's defense and that the denial of access constituted prejudicial error. In support of their contention, their point of departure is a quotation from Judge Learned Hand:

". . . While we must accept it as lawful for a department of the government to suppress documents, even when they will help determine controversies between third persons, we cannot agree that this should in-clude their suppression in a criminal prosecution, founded upon those very dealings to which the documents relate, and whose criminality they will, or may, tend to exculpate. So far as they directly touch the criminal dealings, the prosecution necessarily ends any confidential character the documents may possess; it must be conducted in the open, and will lay bare their subject matter. The government must choose; either it must leave the transactions in the obscurity from which a trial will draw them, or it must expose them fully." [United States v Andolschek, 142 F2d 503, 506 (CA 2d Cir) (1944).]

The classified information with which Captain Gagnon was concerned did not "directly touch the criminal dealings" but, as if in anticipation of this response, the *Andolschek* opinion continued:

". . . Nor does it seem to us possible to draw any line between documents whose contents bear directly upon the criminal transactions, and those which may be only indirectly relevant. Not only would such a distinction be extremely difficult to apply in practice, but the same reasons which forbid suppression in one case forbid it in the other, though not, perhaps, quite so imperatively." [*Ibid.*]

Another statement of the fundamental principle controlling the withholding of privileged information in criminal actions is this:

". . . [T]he Government can invoke its evidentiary privileges only at the price of letting the defendant go free. The rationale of . . . [these] cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake the prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense." [United States v Reynolds, 345 US 1, 12, 97 L Ed 727, 73 S Ct 528 (1953).]

162

See also United States v Ragen, 180 F2d 321 (CA 7th Cir) (1950), affirmed, 340 US 462, 95 L Ed 417, 71 S Ct 416 (1951); United States v Beekman, 155 F2d 580 (CA 2d Cir) (1946); United States v Nichols, 8 USCMA 119, 23 CMR 343 (1957); United States v Reyes, 30 CMR 776 (AFBR 1960), petition denied, 30 CMR 417 (1960); paragraphs 151b(1) and 33f, Manual for Courts-Martial, United States, 1969 (Revised edition).

That the quoted principles are sound in their application to prosecution in Article III courts does not necessarily establish their utility in military law. In a civilian setting, the choice may be between foregoing prosecution or handicapping a domestic Government function, uncovering an informant, or perhaps embarrassing a Government official. But in a military milieu the alternative to foregoing prosecution may be the compromise of methods and sources for developing intelligence information highly important to defense operations or the disclosure of information that could complicate the President's conduct of foreign relations. Even in a military context, however, █ the relevance of the classified information may be so direct that to prosecute using information not available to the defense would be unconscionable.

We do not consider *Andolschek* as requiring that any evidence that might be admissible because it is relevant must be made available to the defense. Potentially admissible evidence might be so remotely relevant we could be confident that its nonavailability had not handicapped the defense. That might have been true in this case if the crucial issue had been only whether Captain Gagnon had experienced great stress when performing the specially secret duties. With access to the highly classified material, Dr. Seidel concluded that Captain Gagnon experienced significant stress. Without access to the same information, the psychiatrists who testified for the defense agreed on the stress

factor. But the point on which they disagreed was Captain Gagnon's judgment under stress. On this point, Dr. Seidel used examples of Captain Gagnon's actions and reactions after receiving specific messages, the content of which Dr. Seidel knew. This is demonstrated by the following passage from the record:

"DC Q. Doctor Seidel, in taking the case history from Captain Gagnon, did you discuss his work in the directorate of intelligence?
"A. I did.

"Q. Did you consider his work significant?
"A. It was a major factor, including—in considering his overall life pattern.

"Q. Did the nature of the work or the messages received have any effect on your diagnosis? Did you consider them in making your diagnosis?
"A. I had to consider them to exercise a judgment, whether the patient was exaggerating the importance of the material or whether it realistically merited the concern he gave it.

"Q. Did you, for example, consider the specific content of any classified message?
"A. Yes.

"Q. How many?
"A. Specific content, I think we mentioned about two—not a verbatim report in messages. But we talked about many messages in general, their general content, which is also classified.

"Q. Can you tell me what these were? How are they particularly significant?
"A. No, sir; I can't.

"Q. These were evidence of his judgment?
"A. I used them in my consideration of his judgmental performance.

"Q. Were these your exclusive evidence of his judgment?
"A. Well, this, on the job, played an important part in my determina-

tion of his performance on the job; yes.

. . . . .

"DC Q. Then am I correct in understanding, Doctor Seidel, that you, after discussing the information which has previously been denied to us, found evidence that the judgment of Captain Gagnon was undependable under stress?

"A. This was my conclusion, that it showed sporadic judgmental difficulties.

"Q. You can't answer the question, how you found evidence of poor judgment?

"A. I can't give you specific examples of—to back up the statement of sporadic judgmental difficulties.

"Q. In short, we accept, we must accept, the statement that you found undependable judgment under stress after discussing elements of his job which you cannot now discuss with me. Is this correct?

"A. That's correct."

In contrast Dr. Simon L. Auster found that Captain Gagnon showed a pattern of stability and that his behavior under stress had been characterized by a substantial amount of control:

"A. I found quite the contrary: a pattern of being able to maintain his equilibrium under considerable stress. Certainly his career experience is an indication of that, that he was able to hold down a position that was, I would suspect, considerably stressful; although I confess that I had some difficulty in getting the details of his actual work situation simply because when I tried to inquire into it it was closed off as a security question and I could not really get details of his work situation and the stress placed on it. But, in general, it's my impression from what I was able to determine that he was able to hold himself together under considerable stress on the job, both in his work in Vietnam, which, as far as I could under-

stand, was fairly stressful, and here, in terms of the capacity to contain himself when under a barrage of what I would under other circumstances and here as well describe as malevolent attacks by a superior. I guess any man who can walk into a situation á deux with his wife and friend in the bedroom and think, 'Well, there's no point in slugging him because it won't do any good,' is, I think, holding together under stress fairly well.

"Q. [DC]. Would you consider this evidence of faulty judgment?

"A. That, I would not; but I can see that some people might. But certainly it indicates an ability— and perhaps this is what's critical— to hold back and consider before acting, as compared to impulsivity.

. . . . .

"Q. Did you in fact find such symptomatology with respect to Captain Gagnon?

"A. I found a pattern quite to the contrary.

"Q. In short, that diagnosis does not fit.

"A. In my evaluation, I could not apply it.

"Q. May I ask why not, Doctor Auster?

"A. Again, I think his behavior has been characterized under stress by a substantial amount of control, of generally considered behavior. Although people may question the wisdom of his decisions, it's not my impression that there was much question about the thoughtfulness of them. I did not find a significant pattern of emotional instability. Again, the pattern has been one of stability. And I would, quite honestly, hope that somebody who has been cleared for security purposes in the military would be somebody who was stable and not over-reactive or given to these qualities. But this has in fact been his pattern: one of general stability, resistance to impulsive expressions of most any kind, responsibility. As a matter of fact, this strain of responsi-

bility is the kind of thing that current research suggests makes an individual more vulnerable.

"Q. Conscientiousness sort of thing?

"A. Conscientiousness; taking one's responsibilities, one's job, seriously; feeling the strong moral and personal implications of what one's job is. If anything, it makes one vulnerable to this kind of thing. It's the person who is not particularly concerned, not particularly responsible, who can brush off the emotional strains, who is not vulnerable."

Bearing in mind that Captain Gagnon's general exercise of good judgment even under stress ■ was a trait found by the defense psychiatrists as contributing to their disagreement of the diagnosis of emotionally unstable personality, we are unable to concur that Dr. Seidel's exclusive access to additional information did not unfairly handicap the defense.

Left for exposition is the manner in which such an issue is to be handled at trial. We are aware ■ that a military judge is without authority to order that highly classified information be made available to a defense counsel who has a need to know. All the judge can do is to attempt a judgment on whether the information is relevant enough that the officers concerned with operations must choose between (1) foregoing prosecution, (2) not using the classified information in any way, or (3) devising a system under which the information can be used at a trial. A judge who has made a determination that this hard choice is unavoidable can then recess the trial while the decision is weighed by the convening authority or a superior in command.

We reverse the decision of the Court of Military Review and return the record of trial to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judges QUINN and DUNCAN concur.